UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, on
behalf of itself and its related insurers,

                    Petitioner,                        24-cv-1870 (PKC)

           -against-                       OPINION AND ORDER

OUTDOOR SPORTS GEAR, LLC, formerly
known as Anthony Industries, Inc., and JARDEN
LLC, formerly known as, and as successor by
merger to, Jarden Corporation,

                    Respondents.
------------------------------------------------------------x

CASTEL, U.S.D.J.

        Petitioner National Union Fire Insurance Company of Pittsburgh, PA ("National Union"), provided various types of insurance to the corporate predecessors of respondent Outdoor Sports Gear, LLC ("OSG") for just over two decades from 1987 to 2007.  After OSG declined to indemnify National Union for three claims it paid out under these policies, National Union commenced an arbitration against OSG and respondent Jarden LLC ("Jarden").  Jarden had assumed OSG's insurance obligations after acquiring OSG's corporate predecessor.  A majority of the three-arbitrator panel (the "Panel") found for National Union and awarded it $515,540.00 in damages (the "Award").

        National Union has filed a petition to confirm the Award.  OSG and Jarden have filed a cross-petition to vacate, or in the alternative, to modify, the Award on various grounds. For reasons that will be explained, the Court will confirm the Award and deny the cross-petition.

BACKGROUND

National Union issued policies of insurance to OSG and its corporate predecessors under a series of annual policies from 1987 to 2007.  (ECF 1-2 at 6.)  Together, these policies comprise the "K2 Program."  Following its acquisition of OSG (then K2, Inc.) in 2007, Jarden assumed OSG's obligations under the K2 Program.  (Id.)  National Union, OSG, and Jarden now disagree over what OSG and Jarden owe National Union pursuant to the K2 Program.

For the purposes of this action, OSG's corporate history begins with its predecessor, Anthony Industries, Inc. ("Anthony Industries").  In 1996, Anthony Industries sold its pool division, Anthony Pools, which eventually became Anthony & Sylvan Pools, Inc. ("A&S").  (ECF 16-16 at 5; ECF 30-6 at 17 n.10.)  OSG became a "wholly-owned subsidiary of Jarden" following the 2007 acquisition.  (ECF 7 ¶ 15.)

Over the course of approximately twenty years, National Union provided OSG, and, later, Jarden, with loss-sensitive insurance, or "a commercial insurance program in which the insured's financial obligations are directly related to the insured's actual loss experience and amounts paid and reserved on claims submitted for coverage by the insured."  (ECF 30-8 at 2-3.)

The way the parties documented each year's insurance agreement shifted over time.  From 1987 to 1989, it consisted of the document containing the insurance policy itself (the "Policy") and the document outlining OSG's obligations to indemnify National Union and the parties' arbitration agreements (the "Indemnity Agreement" or, in later years, the "Payment Agreement").  (ECF 1-4 at 4.)  From 1990 to 2007, each year's documentation also contained a "Policy & Funding Schedule" (the "Schedule"), into which some "economic terms" that had been contained in earlier years' Indemnity/Payment Agreements migrated.  (Id.)  The Court

refers to the entirety of the insurance agreements between the parties for each year as that year's "Program."

The two policies in the K2 Program most relevant to the instant action provided general liability coverage to OSG (then Anthony Industries, Inc., and later, K2) from July 1, 1987, to July 1, 1988 (the "1987 Program") and July 1, 1991, to July 1, 1992 (the "1991 Program"). Both the 1987 and 1991 Policies were issued to Anthony Industries, Inc., before the 1996 sale of the division that would become Anthony & Sylvan Pools, Inc. ("A&S"). (See ECF 7 at 3.)

Between 2011 and 2021, National Union provided coverage to A&S for several asbestos-related claims, specifically, Nash v. Alpha Beta Company, et al. ("Nash"), tendered in or about 2011 under the 1991 Policy; Flood v. Aerco International Inc., et al. ("Flood"), tendered in or about 2016 under the 1987 and 1991 Programs; and Carley v. Anthony & Sylvan Pools, et al. ("Carley") tendered in or about 2021 under the 1987 Program. (ECF 17 ¶¶ 23-27.)

For the 1991 Program, the only documents the parties located were the Policy and the Schedule. No separate indemnity agreement specific to 1991 was produced. OSG and Jarden assert that there never was a 1991 Indemnity Agreement, and that they therefore have no obligation to indemnify National Union for claims under the 1991 Policy, nor any obligation to arbitrate disputes under the 1991 Program. National Union contends that there is an indemnity agreement that governs the 1991 Program, namely the prior indemnity agreement, which was the 1990 Indemnity Agreement.[1] (ECF 30 at 2.) OSG has also refused to indemnify National Union

---

[1] The 1990 Indemnity Agreement is missing its first page, which evidently contained Article I of the agreement and a portion of Article II. (See ECF 30-8 at 64-66.) National Union accordingly produced a sample 1990 Indemnity Agreement. (See ECF 30-12 at 84-87.) The arbitration clause in both the 1990 Indemnity Agreement between the parties and the sample 1990 agreement is presented in full.

on the ground that A&S "had no coverage rights under the 87 or 91 Policies" and that the 1991 Program excludes coverage for asbestos claims.  (ECF 12 ¶¶ 29-30; ECF 21 at 11.)

After OSG rejected National Union's requests for indemnification for Nash, Flood, and Carley, National Union served a demand for arbitration on OSG on May 18, 2022.  (ECF 16-2.)  National Union alleged breach of contract based on OSG's duty to indemnify it and requested damages, interest, and attorney's fees.  (Id. at 3-4.)  National Union later added Jarden to the arbitration pursuant to the 2007 Assumption Agreement.  (ECF 18 at 6.)

On October 24, 2022, the parties submitted position statements identifying issues to be decided in the arbitration.  (ECF 15 at 14.)  "OSG denied the claims against it and objected to the Panel's jurisdiction to determine disputes concerning the 91 Policy" because, it argued, there was no arbitration agreement for the 1991 Policy.  (Id.)  The parties also submitted other motions, including cross-motions for summary judgment, which the Panel denied.  (Id. at 16.)  The parties also conducted depositions and other discovery.  (ECF 1-2 at 10.)

On October 29, 2023, the Panel requested supplemental briefing on "[t]he rationale and authorities to guide the Panel as to its jurisdiction should it determine that the best evidence is that for the 1991-92 policy year, the Parties entered into an Indemnity/Payment Agreement and intended to arbitrate their disputes but that the documents containing the arbitration agreement are missing."  (ECF 30-11 at 6.)  The parties submitted their supplemental briefs the following month.

The final hearing in the arbitration took place on December 4-5, 2023, in New York City.  (ECF 15 at 17.)  OSG continued to object to the Panel's jurisdiction over disputes under the 1991 Program.  (Id.)  "The hearing included the presentation of evidence, argument, and witness testimony."  (ECF 1-2 at 10-11.)  Two witnesses testified for National Union.  (Id. at

11.)  OSG and Jarden did not call any witnesses but cross-examined those of National Union. (Id.)

The Panel issued the Award on February 7, 2024.  (ECF 1-4.)  A majority of the Panel found in favor of National Union, awarding it the full amount of damages alleged, $515,400.00, to be paid by OSG and Jarden no later than February 29, 2024, at which point interest would begin to accrue at a rate of 9 percent per annum on any unpaid balance.  (Id. at 9.) The Panel majority concluded that there was an indemnity agreement in place for the 1991 Program that included an arbitration clause, which gave it jurisdiction over claims under that year.  (Id. at 6.)  That conclusion was based on a number of findings, including that all Indemnity and Payment Agreements the parties had submitted contained arbitration provisions, that it would "make little sense to have issued the 1991 policy as the only year out of 20-year long program without an Indemnity Agreement[,]" and that the 2007 Assumption Agreement between Jarden and National Union contained an "omnibus" arbitration clause that covered all relevant disputes.  (Id.)  The majority went on to find that the disputed payments under the 1991 and 1987 Policies were indemnifiable and that the amount owed was the amount claimed by National Union.  (Id. at 7-8.)  It also ruled against OSG and Jarden on their claim that National Union failed to give them proper notice before making the disputed payments and was therefore not entitled to reimbursement.  (Id. at 8.)

One arbitrator dissented on all grounds relevant to this action.  He found that there was no "clear expression to arbitrate the 1991 policy dispute[,]" taking particular issue with the majority's conclusion that the 2007 Assumption Agreement constituted such an expression.  (Id. at 11.)  The dissent also suggested that the majority failed to show that the parties authorized the

Panel to determine issues of arbitrability, or in other words, that the Panel did not have the authority to decide the scope of its review.  (Id.)

On March 12, 2024, National Union petitioned this Court to confirm the Award pursuant to section 9 of the Federal Arbitration Act ("FAA") and section 7510 of the New York Civil Practice Law and Rules ("CPLR").  (ECF 7 at 2.)  OSG and Jarden cross-petitioned for vacatur, or in the alternative, modification, of the Award on April 4, 2024, under sections 10 and 11 of the FAA and section 7511 of the CPLR.  (ECF 15 at 21-22.)

On November 17, 2025, the Court requested supplemental briefing on the existence of an indemnity and arbitration agreement for the 1991-92 period.  (ECF 27.)  National Union submitted a letter brief on December 5, 2025, OSG and Jarden submitted a response on December 12, 2025, and National Union replied on December 18, 2025.  (ECF 30, 31, 32.)

STANDARD FOR CONFIRMATION OR VACATUR

Under the Federal Arbitration Act ("FAA"), when parties have agreed that a court may enter judgment upon an arbitration award, "any party to the arbitration may apply to the court so specified [in their agreement] for an order confirming the award[.]"[2]  9 U.S.C. § 9.  The court "must grant such an order unless the award is vacated, modified, or corrected" pursuant to sections 10 and 11 of the FAA.  Hall Street Associates, L.L.C. v. Mattel, Inc., 552 U.S. 576, 582 (2008).  Therefore, a "court's function in confirming or vacating an arbitration award is severely limited."  Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12

---

[2] Upon the assertion of valid and independent basis for federal jurisdiction, the FAA and not New York's CPLR governs confirmation and vacatur in federal court.  See, e.g., Park Lane IBS, LLC v. Unbnd Group Pty Ltd., 23-cv-8620, 2024 WL 4123515, at *3 (S.D.N.Y. Sept. 9, 2024) (Castel, J.) (collecting cases applying the FAA where the applicable arbitration agreements were silent on the governing law).  National Union properly invokes this Court's diversity jurisdiction.  See 28 U.S.C. § 1332.

(2d Cir. 1997) (quoting Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 808 (2d Cir. 1960)).  The confirmation of an arbitration award is normally "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court."  D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (quoting Florasynth, Inc. v. Pickholz, 750 F.2d 171, 176 (2d Cir. 1984)).

This Court's task is not "to review the record of the arbitration proceeding for errors of law or fact."  Saxis Steam Ship Co. v. Multifacs International Traders, Inc., 375 F.2d 577, 582 (2d Cir. 1967).  All that is required for a district court to confirm an arbitration award is a "barely colorable justification" from the arbitrators for the outcome of the arbitration.  Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G., 579 F.2d 691, 704 (2d Cir. 1978).  There should therefore "be great hesitation in upsetting an arbitration award."  Odeon Capital Group LLC v. Ackerman, 864 F.3d 191, 195 (2d Cir. 2017) (quoting Karppinen v. Karl Kiefer Machine Co., 187 F.2d 32, 34 (2d Cir. 1951)).

A court reviewing an arbitration award under the FAA "can confirm and/or vacate the award, either in whole or in part."  Scandinavian Reinsurance Company Ltd. v. Saint Paul Fire & Marine Insurance Company, 668 F.3d 60, 71 (2d Cir. 2012) (quoting D.H. Blair, 462 F.3d at 104).  Courts "may" also modify arbitral awards if, among other things, "there was an evident material miscalculation of figures" or "the arbitrators have awarded upon a matter not submitted to them[.]"  9 U.S.C. § 11.

Courts "treat a petitioner's application to confirm or vacate an arbitral award as 'akin to a motion for summary judgment[.]'"  City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 136 (2d Cir. 2011) (quoting D.H. Blair, 462 F.3d at 109).  As such, the Court will "view the evidence in the light most favorable to the non-moving party and draw all reasonable

inferences in its favor[.]"  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).  "A party asserting

that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular

parts of materials in the record [.]"  Fed. R. Civ. P. 56(c)(1).  "Where the undisputed facts in the

record require the matter of arbitrability to be decided against one side or the other as a matter of

law, we may rule on the basis of that legal issue and avoid the need for further court

proceedings."  Meyer v. Uber Technologies, Inc., 868 F.3d 66, 74 (2d Cir. 2017) (cleaned up).


DISCUSSION

      I.        Did the Panel Exceed its Powers?

        Under section 10 of the FAA, an arbitration award may be vacated if "the award

was procured by corruption, fraud, or undue means[,]" "there was evident partiality or corruption

in the arbitrators[,]" "the arbitrators were guilty of misconduct," or "the arbitrators exceeded

their powers, or so imperfectly executed them that a mutual, final, and definite award upon the

subject matter submitted was not made."  9 U.S.C. § 10(a)(1)-(4).  The relevant inquiry when a

party makes an allegation under section 10(a)(4) that the arbitrators "exceeded their powers" is

"whether the arbitrators had the power, based on the parties' submissions or the arbitration

agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue."

DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 824 (2d Cir. 1997).

        OSG and Jarden argue that the Panel majority exceeded its powers by (1)

determining that disputes under the 1991 Program are arbitrable and indemnifiable by

concluding that there is an associated indemnity agreement with an arbitration clause, (2)

erroneously finding that Nash, Flood, and Carley payments to A&S are indemnifiable despite the

relevant policies not covering A&S and the presence of an asbestos exclusion in the 1991 Policy, and (3) issuing an award for Nash that lacks supporting evidence and is thus "irrational."

### A. The Arbitrability of 1991 Program Disputes

OSG and Jarden contend that the Panel lacked authority to adjudicate disputes under the 1991 Program because, in their telling, there is no indemnity agreement and arbitration clause for that year. (ECF 15 at 23-24.) In other words, they assert that the 1991 Program disputes are not arbitrable. National Union disagrees, arguing that the 1990 Indemnity Agreement attaches to the 1991 Policy.

"The Second Circuit has established a two-part test for determining arbitrability of claims not involving federal statutes: (1) whether the parties agreed to arbitrate disputes at all; and (2) whether the dispute at issue comes within the scope of the arbitration agreement." ACE Capital Re Overseas Ltd. v. Central United Life Insurance Co., 307 F.3d 24, 28 (2d Cir. 2002). The Court first focuses on whether there was a valid arbitration agreement between National Union and OSG that became binding on Jarden.

### i. Did the Parties Agree to Arbitrate?

Delegation of arbitrability questions to arbitrators may only be accomplished through clear and unmistakable evidence in the relevant agreement that the parties intended delegation. See DDK Hotels, LLC v. Williams-Sonoma, Inc., 6 F.4th 308, 317 (2d Cir. 2021). This rule, however, does not apply where, as here, the parties dispute the very existence of an agreement to arbitrate. While parties may delegate to an arbitrator the task of determining an arbitration agreement's "enforceability and scope," they may not delegate "the fundamental

question of whether they formed an agreement to arbitrate in the first place." Doctor's Associates, Inc. v. Alemayehu, 934 F.3d 245, 251 (2d Cir. 2019) (citing Granite Rock Co. v. International Brotherhood of Teamsters, 561 U.S. 287, 299-301 (2010)).  To the extent that the Panel decided that the parties agreed to arbitrate disputes under the 1991 Program, it exceeded its powers.

The Court will therefore determine de novo whether the parties had a valid agreement to arbitrate disputes under the 1991 Program.  See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995); Olin Holdings Ltd. v. State of Libya, 73 F.4th 92, 104-05 (2d Cir. 2023).  While the Panel lacked the authority to determine whether the parties had a valid arbitration agreement governing 1991 Program disputes, the Court finds the error does not warrant upsetting the Award, as it concludes the parties did have such an agreement.

The Court applies state contract law, as is appropriate "[w]hen contract formation is at issue in an FAA case[.]"  Adams v. Suozzi, 433 F.3d 220, 227 (2d Cir. 2005).  New York law controls.  See Bennett v. Sterling Planet, Inc., 546 F. App'x 30, 33 (2d Cir. 2013) (summary order) (explaining that in a diversity case, the parties' reliance on a forum's law in their briefing "ends the choice-of-law inquiry").  The standard for proving the existence of an agreement to arbitrate is by a preponderance of the evidence.  Progressive Casualty Insurance Co. v. C.A. Reaseguradora Nacional De Venezuela, 991 F.2d 42, 46 (2d Cir. 1993).  The burden of proof lies with the arbitration agreement's proponent.  See American Centennial Insurance Co. v. Williams, 233 A.D.2d 320 (2nd Dep't 1996).

National Union rejects the assertion that there is no indemnity agreement for the 1991 Program year and urges that the 1991 Schedule is attached to the prior year's indemnity agreement.  It explains that "[f]or certain years, National Union issued schedules or addenda that

attached to, and incorporated the terms and conditions of a prior indemnity or payment agreement[]. This is exactly what happened for the 1991-92 policy period. For this particular year, National Union issued a 1991 Policy and Funding Schedule in connection with the 1991-92 Policy, and that Policy and Funding Schedule would have attached to, and incorporated the terms and conditions of the prior indemnity agreement, and by extension, arbitration clauses."[3]  (ECF 30 at 2.)  The Court finds that National Union has proven this to be the case.

First, National Union presented testimony that it did not issue schedules for new program years without attaching them to an indemnity agreement.  Aaron DeHaven, Assistant Vice President of Loss Portfolio Transfers and Loss Sensitive Accounting in the Risk Management department of AIG, Inc.'s Property and Casualty insurance businesses, explained in an affidavit: "For loss-sensitive programs that incepted in the 1980s and 1990s, National Union would not issue Schedules that were not related to either (i) a newly- issued indemnity agreement for the same policy period or (ii) a pre-existing indemnity agreement for a previous policy period."  (ECF 16-17 at 4.)

DeHaven's testimony is bolstered by the language in the 1991 Schedule and the sample 1990 Indemnity Agreement.  The 1991 Schedule is titled "POLICY AND FUNDING SCHEDULE (Indemnity Agreement)," which DeHaven explains "indicates that this schedule is a schedule that attaches to an indemnity agreement."  (ECF 31-10 at 23.)  And Article I of the sample 1990 Indemnity Agreement reads: "The Program is a uniquely negotiated, single contract and no part of the Program would have been issued without the other parts being in force. Unless otherwise agreed, should the parties later adopt revised or different Schedule(s) or should

---

[3] National Union also suggests that the Assumption Agreement provides an alternative basis for finding that there is an arbitration agreement governing the 1991 Program.  (ECF 32 at 2.)  The Court does not find it necessary to reach this argument.

renewals of the Policy(ies) be issued, such Schedule(s) and Policy(ies) shall be subject to this Agreement and be part of the Program."[4]  (ECF 30-12 at 84.)

Second, DeHaven explained that "in instances in which there were no substantive changes to the existing indemnity agreement in the subsequent policy year, it was not uncommon for National Union to choose not to issue a new indemnity agreement in the subsequent policy period, and instead to simply issue a new Schedule for the subsequent year, which would attach to the previous year's indemnity agreement."  (ECF 16-17 at 4.)  There were "no substantive changes" from the 1990 Schedule to the 1991 Schedule.  (ECF 30-8 at 5.)

Further, the record demonstrates that it was not unusual for National Union to annex new schedules to older indemnity agreements.  For example, the 2005, 2006, and 2007 Schedules are annexed to the 2004 Payment Agreement.[5]  Those schedules each state that they are "[a]nnexed to the PAYMENT AGREEMENT effective on 07/01/2004."  (ECF 30-12 at 303, 349, 388.)

OSG and Jarden point out that the 1991 Schedule does not identify, as do the 2005-2007 schedules, the particular year's indemnity agreement to which it is annexed.  (ECF 31 at 2.)  DeHaven explained, however, that "during this time period [the 1980s and 1990s] the Schedules did not always indicate which particular agreement that Schedule attached to[,]" (ECF 16-17 at 4), and that this was just "the way that AIGRM[6] did that at this time[,]" (ECF 31-10 at 23-24).  This lapse is not particularly probative given the testimony submitted by National Union that its practice when it was not issuing a new indemnity agreement for a new schedule was to attach the new schedule to the prior year's indemnity agreement and not, for example, to an

---

[4] The Court discusses the applicability of the sample 1990 Indemnity Agreement below.
[5] "Payment Agreements" appear to have replaced "Indemnity Agreements" in the program documentation between the parties in 1998 but still contain terms governing indemnification and arbitration.
[6] National Union is a part of AIG Risk Management, Inc., or "AIGRM."

indemnity agreement from three years earlier.  It would make even less sense to have attached the 1991 Schedule to an indemnity agreement from before 1990 considering that National Union changed its standard indemnity agreement around that time.  (See ECF 16-18 at 9.)

OSG and Jarden further object that enforcing the 1990 Indemnity Agreement to resolve disputes under the 1991 Program would run afoul of the doctrine of definiteness because the 1990 Indemnity Agreement is incomplete.  (ECF 31-10 at 9 n.2.)  The Court disagrees.

Under the doctrine of definiteness, a court may not enforce a contract "unless it is able to determine what in fact the parties have agreed to[.]"  166 Mamaroneck Avenue Corp. v. 151 East Post Road Corp., 78 N.Y.2d 88, 91 (1991).  "If essential terms of an agreement are omitted . . . no legally enforceable contract will result."  Brookhaven Housing Coalition v. Solomon, 583 F.2d 584, 593 (2d Cir. 1978).  "A term is essential if 'it seriously affects the rights and obligations of the parties and there is a significant evidentiary dispute as to its content.'"  B. Lewis Productions, Inc. v. Angelou, 01-cv-0530, 2005 WL 1138474, at *6 (S.D.N.Y. May 12, 2005) (Mukasey, J.) (quoting Ginsberg Machine Co., Inc. v. J. & H. Label Processing Corp., 341 F.2d 825, 828 (2d Cir. 1965)).  "Before rejecting an agreement as indefinite, a Court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear."  Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 483 (1989).

OSG and Jarden rely on Dreyfuss v. eTelecare Global Solutions-US, Inc., 08-cv-1115, 2008 WL 4974864 (S.D.N.Y. Nov. 19, 2008) (Sullivan, J.), aff'd, 349 F. App'x 551 (2d Cir. 2009), in arguing that the 1990 Indemnity Agreement is indefinite.  In Dreyfuss, an employer sought to compel arbitration against a former employee.  Id.  While there was no doubt that the employee had signed a document called "Mutual Agreement to Arbitrate Claims," the employee

resisted arbitration because only two pages were in the record, with an unknown number of pages missing, and the section titled "Claims Covered by the Agreement" was incomplete.  Id. at *5-6.  The court refused to enforce the document, finding that essential terms were missing and no standard agreement existed to fill in the gaps, as only some of the other employees had signed arbitration agreements, and those agreements varied significantly.  Id. at *8-9.  The court also distinguished cases compelling arbitration despite gaps in the parties' agreements on the basis that the agreements, though incomplete in other ways, contained complete copies of the arbitration clauses.  Id. at *7 ("[T]he present case involves not the enforceability of an arbitration provision within a broader contract, but the enforceability of an arbitration agreement that *is itself* the contract.").

But here, unlike Dreyfuss, National Union has presented both a complete copy of the arbitration provision and a standard agreement that can be used to fill any gaps in the larger 1990 Indemnity Agreement.  See Jamieson v. Securities America, Inc., 19-cv-1817, 2019 WL 6977126, at *3 (S.D.N.Y. Dec. 20, 2019) (Briccetti, J.) (enforcing arbitration provisions that "are presented in full, containing all essential terms and missing no pages, even though Securities America does not provide the client or customer agreements [containing the arbitration provisions] in full").  The Court is also comfortable enforcing the entirety of the 1990 Indemnity Agreement, though Article I and part of Article II are missing, as it finds that the sample 1990 document produced by National Union can be used as a gap-filler.  The 1990 Indemnity Agreement and the 1990 sample are virtually identical, save for the fact that the 1990 Indemnity Agreement is missing Article I and part of Article II.  (See ECF 30-8 at 64-66; ECF 30-12 at 84-87.)  The sample shows that Article I consists of a description of how the various documents in

- 14 -

the program year function together, and that Article II contains the definitions of various terms used in the program documentation.[7] (See ECF 30-12 at 84.)

OSG and Jarden finally suggest that there is no reason to believe that the Indemnity Agreement presented in tandem with the 1990 Schedule is actually itself a 1990 Program document. (ECF 31-11 at 10.) While the missing first page means that the Indemnity Agreement attached to the 1990 Schedule is not dated, the Court does not share OSG and Jarden's skepticism, as the 1990 Schedule and Indemnity Agreement together represent "a true and correct copy of what is in [National Union] systems[,]" (ECF 30-11 at 10), and DeHaven testified that the 1990 Indemnity Agreement is a standard form document of National Union's, which a review of the 1990 sample corroborates, (id. at 7.)

Having reviewed the evidence in the record, the Court concludes that National Union has come forward with evidence that would permit a reasonable factfinder to conclude by a preponderance of the evidence that the 1991 Program year was tied back to the 1990 Indemnity Agreement and arbitration clause. OSG and Jarden have not come forward with evidence or argument to rebut National Union's evidence such as to enable a reasonable factfinder to find otherwise. Further, as a matter of contract interpretation, the Court concludes that the 1990 document is sufficiently definite to enforce.

        ii.      The Scope of the Arbitration Clause

The Court next turns to the question of whether the disputes under the 1991 Program fall within the scope of the arbitration clause in the 1990 Indemnity Agreement. See

---

[7] The sample contains definitions labeled "A" through "W." The 1990 Indemnity Agreement contains definitions labeled "P" through "W." The only differences are slight and are found in the definitions of "Board and Bureau Charges" and "Insurance-Related Expenses." (See ECF 30-8 at 65; ECF 30-12 at 84-85.)

ACE Capital, 307 F.3d at 28.  Parties may delegate such questions of scope to arbitrators.  See DDK Hotels, LLC, 6 F.4th at 318.  The Court agrees with OSG and Jarden that there was no delegation here but finds that the 1991 Program disputes are encompassed by the applicable arbitration clause.

Arbitrability is "an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise."  Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quoting AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649 (1986)).  The arbitration clause in the 1990 Indemnity Agreement, mandating arbitration of "[a]ll disputes or differences arising out of the interpretation of this Agreement," does not show clearly and unmistakably that the parties delegated arbitrability determinations to the Panel.  Accord National Union Fire Insurance Co. v. Advanced Micro Devices, Inc., 16-cv-5699, 2016 WL 4204066, at *3 (S.D.N.Y. Aug. 4, 2016) (Koeltl, J.) (interpreting identical language).  Clear and unmistakable evidence is often found where an arbitration agreement incorporates the rules of an arbitral forum that grants arbitrators the power to ascertain their own jurisdiction, or where an arbitration agreement "expresses the intent to arbitrate all aspects of all disputes[.]"  DDK Hotels, LLC, 6 F.4th at 318-19.  Because neither is true of the arbitration clause here, the Court will evaluate its scope independently using "ordinary principles of contract interpretation[.]"[8] See Local Union 97, International Brotherhood of Electrical Workers, AFL-CIO v. Niagara Mohawk Power Corp., 67 F.4th 107, 114 (2d Cir. 2023).

---

[8] The Court declines OSG and Jarden's invitation to apply the rule in Cusimano v. Berita Realty, LLC, 103 A.D.3d 720, 721 (2d Dep't 2013), that requires an arbitration agreement's proponent to demonstrate that the agreement "expressly and unequivocally" covers the parties' disputes.  See Norcast S.ar.l. v. Castle Harlan, Inc., 12-cv-4973, 2014 WL 43492, at *5 n.3 (S.D.N.Y. Jan. 6, 2014) (Crotty, J.) (noting "[t]here is some question . . . about whether the FAA preempts" the standard because it "appear[s] to impose a higher standard for arbitration agreements than for contracts in general").

Though OSG and Jarden argue that the Panel majority "erroneously determined the issue of arbitrability," (ECF 31 at 3), they do not make any arguments on whether the arbitration clause in the 1990 Indemnity Agreement encompasses the parties' 1991 Policy disputes. Nor do they contend that the parties' disputes under the 1987 Program fall outside the scope of the 1987 Indemnity Agreement, and the Court discerns no material differences between the 1987 and 1990 arbitration clauses. The 1990 clause reads as follows: "All disputes or differences arising out of the interpretation of this Agreement shall be submitted to the decision of two (2) Arbitrators, one to be chosen by each party, and in the event the Arbitrators fail to agree, to the decision of an Umpire to be chosen by the Arbitrators." (ECF 30-8 at 64.) The 1987 clause is virtually identical.[9] (See ECF 16-5 at 18.) This language covers the parties' disputes because determining whether OSG and Jarden must indemnify National Union necessarily involves the interpretation of the Indemnity Agreement between them.

OSG and Jarden's arguments that vacatur or modification of the Award is warranted on the basis that disputes under the 1991 Policy are not arbitrable therefore fail.

B.  Were the Three Asbestos Claims Covered By Indemnification?

OSG and Jarden next argue that the Panel majority exceeded its powers in awarding National Union indemnity payments made to A&S for the Nash, Flood, and Carley asbestos claims under the 1987 and 1991 Policies because A&S was not covered by either policy and the 1991 Policy excluded asbestos claims. (ECF 21 at 11.) National Union responds that at the time it paid out Nash, Flood, and Carley, it had neither located the asbestos exclusion nor

---

[9] The 1987 arbitration clause reads: "All disputes or differences arising out of the interpretation of this Agreement shall be submitted to the decision of two (2) Arbitrators, one to be chosen by each party and in the event of the Arbitrators failing to agree, to the decision of an Umpire to be chosen by the Arbitrators." (ECF 16-5 at 18.)

- 17 -

determined that A&S had no rights under the policies. (See ECF 30-5 at 17-23.) It further explained that it was under a duty to make the payments to A&S as it is "axiomatic that an insurer with a potential for coverage owes an obligation to provide a defense while it investigates the claim brought." (ECF 16-16 at 6 (emphasis omitted).) OSG and Jarden also argue National Union should have clawed back the payments it made to A&S under a reservation of rights. (ECF 12 at 10.) Finally, OSG and Jarden suggest their promise to indemnify National Union is unenforceable under Abakan, Inc. v. Uptick Capital, LLC, 943 F. Supp. 2d 410, 415 (S.D.N.Y. 2013), because it is not "clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." (ECF 15 at 27.)

The Court's inquiry is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach" the question of whether OSG and Jarden must reimburse National Union for payments pursuant to Nash, Flood, and Carley, "not whether the arbitrators correctly decided that issue." See DiRussa, 121 F.3d at 824. And "'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' a court's conviction that the arbitrator has 'committed serious error' in resolving the disputed issue 'does not suffice to overturn his decision.'" ReliaStar Life Insurance Co. of New York v. EMC National Life Co., 564 F.3d 81, 86 (2d Cir. 2009) (quoting United Paperworkers International Union AFL-CIO v. Misco, Inc., 484 U.S. 29, 38 (1987)). Here, the parties unquestionably submitted disputes arising under the 1987 Policy to the Panel. OSG and Jarden do not argue that disputes concerning the 1987 claims fall outside the scope of the arbitration clause in the 1987 Indemnity Agreement. And as explained above, the Court finds that the parties also submitted to the Panel their disputes under the 1991 Policy. The Court will

- 18 -

not consider, as OSG and Jarden ask it to do, the correctness of the Panel's determination that they are required to indemnify National Union for the three asbestos claims.

C.    Was the Award Irrational?

OSG and Jarden's final argument that the Panel exceeded its powers is that the portion of the Award based on Nash is "irrational" because it is based on "scant evidence[.]" (ECF 15 at 28.)  This ground for vacatur appears to derive from New York CPLR section 7511(b)(1)(iii).  The New York Court of Appeals has explained that "[i]t is well-settled that an arbitrator 'exceed[s] his power' under the meaning of the statute where his 'award violates a strong public policy, is irrational or clearly exceeds a specifically enumerated limitation on the arbitrator's power[.]'"  In re Kowaleski (New York State Department of Correctional Services), 16 N.Y.3d 85, 90 (2010) (quoting New York City Transit Authority v. Transport Workers' Union of America, Local 100, AFL-CIO, 6 N.Y.3d 332, 336 (2005)).  As noted previously, the FAA, and not New York's CPLR, controls in this case.  By expanding the "exceeds his power" inquiry, New York's "irrational" standard impinges on the liberal federal arbitration policy underlying the FAA by adding an additional potential hurdle to the confirmation of arbitral awards.  See, e.g., Progressive Casualty Insurance, 991 F.2d at 46; see also C.T. Shipping, Ltd. v. DMI (U.S.A.) Ltd., 774 F. Supp. 146, 148-49 (S.D.N.Y. 1991) (Carter, J.) ("It is therefore clear that the [FAA], when it is applicable, preempts state statutes purporting to create alternative grounds for confirming or vacating arbitration awards.").

In any event, the Panel majority's finding was certainly based on evidence in the record, as National Union submitted an invoice spreadsheet and accompanying reports "that set forth the payments made under the Policies, and the manner in which those payments were

allocated to the Policies." (ECF 18 at 11.) The Panel also had before it letters from counsel for

A&S and OSG and Jarden to National Union acknowledging receipt of funds by A&S.[10] (ECF

1-4 at 8.)

II.    Did the Panel Act in Manifest Disregard of the Law?

"Manifest disregard of the law," a judicially created ground for vacatur applied in

the Second Circuit, requires a "heavy burden" of proof that only exists in "exceedingly rare

instances." Smarter Tools Inc. v. Chongqing SENCI Import & Export Trade Co., Ltd., 57 F.4th

372, 383 (2d Cir. 2023) (quoting T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc., 592 F.3d

329, 339 (2d Cir. 2010)). "An arbitration award manifestly disregards the law only if '(1) the

arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and

(2) the law ignored by the arbitrators was well-defined, explicit, and clearly applicable to the

case.'" Id. (citing Porzig v. Dresdner, Kleinwort, Benson, North America LLC, 497 F.3d 133,

139 (2d Cir. 2007)). Only "where some egregious impropriety on the part of the arbitrator is

apparent" may manifest disregard of the law serve as a basis for vacatur. Id. (quoting T.Co

Metals, 592 F.3d at 339).

OSG and Jarden bring two challenges to the Award on this ground. First, they

contend the Panel majority improperly shifted the burden of proof in determining the damages in

Nash, which they assert National Union never paid. Second, they argue National Union was

required under New York law to give notice before making payments in Nash, Flood, and Carley.

The Court addresses each in turn.

---

[10] While the letters referenced the $461,643.72 payment as covering Flood, OSG and Jarden more recently "attribute only $256,286.87" to Flood. (ECF 1-4 at 8.) The difference is exactly the amount National Union invoiced for Nash. (Id.)

A.  New York Law on Burden of Proof for Damages Claims

OSG and Jarden argue that the Panel majority improperly shifted the burden of proof on the quantum of damages attributable to the Nash claim from National Union to them. Under New York law, when "the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, 'the burden of uncertainty as to the amount of damage is upon the wrongdoer.'" Process America, Inc. v. Cynergy Holdings, LLC, 839 F.3d 125, 141 (2d Cir. 2016) (quoting Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926 (2d Cir. 1977)).

OSG and Jarden argue that the Panel awarded National Union the amount it claimed it was owed for Nash, even though National Union offered no supporting evidence, simply because OSG and Jarden failed to "show the amount was uncertain" or "prove non-payment of the amount[.]" (ECF 21 at 14.)  In other words, OSG and Jarden assert that National Union should have been required to supply evidence to support the claimed amount and the Panel should have turned to them only if National Union met its burden.  But that is exactly what the Panel did.  OSG and Jarden simply disagree with the Panel's finding that the evidence, described in the preceding section, was sufficient.  (See ECF 18 at 12-13; ECF 1-4 at 8.)  OSG and Jarden's claim that the Panel manifestly disregarded the law on the burden of proof therefore fails.

B.  New York Law on Notice to Indemnitors

OSG and Jarden also argue that the Panel ignored New York law on the notice required to be given to an indemnitor by the indemnitee before making a payment that the

indemnitee would subsequently seek to have reimbursed.  (ECF 15 at 30.)  Under New York law, if an indemnitee does not provide advance notice to its indemnitor, it must, in order to recover, establish that the indemnitee "would have been liable and that there was no good defense to the liability[,]" and also that the amount paid was reasonable.  Feuer v. Menkes Feuer, Inc., 8 A.D.2d 294, 299 (4th Dep't 1959).  OSG and Jarden claim National Union never provided this notice and assert that the Panel was thus obligated to require National Union to show that it was actually liable to A&S for the payments.  (ECF 15 at 30-31.)

OSG and Jarden's argument fails on this record.  The Panel did inquire into whether notice was given and found that National Union "provided evidence that OSG was on notice" of all relevant claims.  (ECF 1-4 at 8.)  It therefore did not ignore the law.  OSG and Jarden reply that the evidence relied on by the Panel is insufficient.  (ECF 21 at 13-14.)  The merit of that argument is doubtful.  (See, e.g., ECF 1-4 at 8 ("With regard to Carley, A&S and OSG both tendered this claim and jointly argued to National Union that both insureds had coverage[.]").)  But even if they are correct, the sufficiency of the evidence has no bearing on the inquiry here, which is simply whether the Panel knowingly disregarded the law.

CONCLUSION

National Union's motion to confirm the Award is GRANTED, and the Award is confirmed in its entirety.  OSG and Jarden's motion to vacate, or in the alternative, to modify, the Award is DENIED.  All other relief is denied.

- 23 -

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:      New York, New York
           February 2, 2026